Case No. 08-1476, David Almeroth v. Richard Doermer, et al. Counsel, you're Mr.? I'm William Packer. I represent David Almeroth. Right. We'll give you 15 minutes and I would package all of your issues together if you would. Could I reserve a couple minutes? Of course. Yes. And then you can split, the other two sets of lawyers can split your time eight and a half a piece or thereabouts. Okay. Three sets of lawyers. I'm Kenneth Duck, I represent Richard Doermer, Richard Doermer Limited, and I represent David Almeroth v. Richard Doermer, et al. Is the central issue for all of you going to be the loss causation issue? No, there's a statute of limitations issue there too that's lurking. But that is going to really overshadow anything else, right? No, there's an additional intervening causation issue. Right. And the statute of limitations issue, of course, would preclude the Grinnella defendant from even arguing anything at all if you were to prevail on that issue. But the intervening causation issue is still an aspect of practical cause which has to be analyzed in terms of loss causation. I think you can safely assume we've read your brief. You have our undivided attention, counsel. Thank you, Your Honor. Again, Bill Nackerling for David Almeroth. This case has been on a long road to the trial, including a trip to this court where the attorney general's office was involved. And, of course, its interference claims against the Grinnella defendants were reinstated. Right. The trial court avoided a trial on all the disputed material fact issues. And at this point, the unrebutted expert testimony that demonstrated that these defendants, through their incompetence, breaches of duty, hopeless conflicts, and bad faith combined to destroy David Almeroth's financial future. The court did this by misapplying the wrong law and the wrong claims. And you set it out very well in your brief. At page 29, you say, in order to accomplish the objectives behind professional malpractice cases. And that's how you characterize this. David should be entitled to recover damages that would place him in the position he would have occupied but for Snodgrass and Evanston's malpractice, which is the difference between a properly diversified portfolio and his now worthless stock. Right. There's only one problem. You don't cite to a single case. Well, we do cite to a case. Oh, I know. But when you set out your issue there, and then you don't cite to a case, what's your best case for that precise argument? Your best case? For the causation argument? I believe it's... Trident? No. Our best case in the entire argument is the Barton v. Hinehold Commodities. Okay. Barton v. Hinehold Commodities, our Illinois Supreme Court, said that loss causation is a term developed in the federal common law concerning tendency securities... Well, let's talk for a minute about something else. Before we start dealing with labels, let's talk about just how this thing reasons out. What you're talking about in the allegations that you made is transactional causation, a cause and effect, but for. Now, the question is, how far do we extend the issue of consequential damages, which is what we're talking about here when we say that but for this bad advice. It's as if, you know, on the one extreme, you have a situation where you get into a cab and he's negligent in his driving. And as a result, you miss a chance to buy the lottery ticket that would have been yours had you gotten to where you were going on time. Okay. Now, in ordinary tort law, one of the questions involved is foreseeability, which is a proximate cause type of analysis. But against that, you have to play, because I think there's still something alive in the notion of condition and cause, albeit that's a foreseeability analysis also. But the question is, how far we want to take a contract or a breach of it or a relationship and a breach of the relationship in one context and extend liability clear across the globe for whatever happens. And I don't mind telling you now that I see this as a question that seems to be more conciliatory towards the malpractice issue than where the party that you're dealing with is there, to protect your investments, as opposed to the malpractice issue involving an attorney who is not there to protect your investments because that's not his area of expertise. His area of expertise and the reason you've come to the attorney is so that he can guide you in making an advantageous, getting an advantageous settlement or result in your divorce. So then the aspect that by giving you this kind of advice, which may or may not be attuned to what you came to him for, namely to preclude or to minimize your allocation to your spouse, results in damage somewhere else, namely in the crash of the market. It seems to me that there is a distance and I don't mind telling you that at the outset because that's what I'm going to be, you know, deliberating on and I would hope that my colleagues would give that some consideration too. So that basically what we're talking about is how collateral consequential damage awards ought to be, whether it's under tort law, in contracts we have contemplation of the parties, Hadley versus Daxson. I still remember that from law school. We also had Worman. Well, except that the economic loss, they refused to extend the tort to economic loss, but that's not the problem here because I think tortious interference or malpractice is extended, you know, but the malpractice is in a different sphere. And the damage is wholly collateral, albeit a foreseeability argument might still perhaps be made, although I think the courts are attuned to think that where the damage incurred is too collateral, they'll head it off at the pass by saying it's not foreseeable. But it is foreseeable in the universe of discourse, but not foreseeable enough because it's so adjunctive, it's so oblique to the relationship context in which the breach occurs, you see. So I think, as far as I'm concerned, that Mr. Axelrod here or Snodgrass is that, might be at greater jeopardy in my thinking right now than Mr. Dormer or Mr. Renauld. Okay. Well, then let me address your concern, Your Honor. Putting aside loss causation, which I, again, think was misapplied, it doesn't apply under Martin vs. Heinholt to anything except a fraud misrepresentation. Well, why should that be? I mean, the question is, how do you control the relationship between the one context in which the fault is incurred and the other context in which the damage is incurred? Now, loss causation seems to have divergent application. Under one analysis, it means that we won't, you can never recover for an oblique damage unless the default or unless the fault is a cause of the cause of your loss. In other words, the fault has to affect the market so that the effect on the market then causes you to lose. On the other hand, there have been cases that have described, like the Trident case, that loss causation as not looking to the source of the loss, but to the loss to the party. So when we talk about loss causation, it's really a misnomer. If we talk about the loss having to impact on the cause of the loss, then we're talking about the loss in depreciating the stock, which then causes the loss to the person. But in ordinary tort law, we look to the loss incurred by the person and the foreseeability of it when we deal with consequential damages in ordinary tort contexts. And, Your Honor, I agree with you that the standard approximate clause of standards in Illinois law under contract in breach of tortious interference with contract and malpractice require an element of foreseeability or a contemplation of the parties. And that's the standard that should have been applied by this judge. And based on these facts, these two professionals were hired to shepherd him through a divorce, protect his assets. But they weren't hired to protect the value of his stock. No, but they were hired to allow him access to his assets. They were hired to negotiate. Fine, but depriving him of access to his assets establishes the before. But then you have the second aspect to account for. Are they the legal cause? That's what the courts call proximate cause. And proximate cause means is this loss something that the law wants to make them accountable for? But in the law, since it's clearly foreseeable that if you negotiate and tell your client to enter into a marital settlement agreement that is completely botched, that is carelessly done, that, in fact, does not allow you to transfer and assign to your ex-spouse the securities that were supposed to be divided under the marital settlement agreement. As an attorney, you botch your job. Then you go and botch it further when you don't do anything. Well, you might be able to then sue if, I mean, in legal malpractice, which still has certain limitations on it, because the law has not yet fully opened its arms to claims against experts or lawyers, you give advice, it would be for bad terms between the results and terms that came about and the damage involved in the allocation. But it would not extend to the collateral impact on stock market valuations of your shares. No, Your Honor. If, in fact, you negotiate a marital settlement agreement that puts you in a financial prison where you cannot, you cannot exit the market, you cannot realize that you diversified on your business. You have but for, but it's a stretch to take it to proxy. No, it's clearly foreseeable. When you're negotiating a marital settlement agreement for a client whose largest asset is his holdings in Condisco Securities. You can make that statement. Basically, you did. That but for this bad investment advice, he would have exercised his options earlier. Right. Right. Now, but then can you go to step two? But for the bad advice, the stock would have not lost its value. No, but that's. Of course not. That's the record. Right. You just conceded it. We're done. No. But that's the wrong standard. I know what you're saying. That's the wrong standard. But let's suppose that you're faced with a panel up here that doesn't think there's anything different between loss causation and the standard common law principles of proximate cause in tort and hack. Okay. That loss causation is just a synonym for what the law has always been. And that really loss causation hasn't changed the underlying principles of proximate cause at all. It's foreseeability. Exactly. So you go back. Was it foreseeable when they gave the bad advice about exercising his options? Was it foreseeable that they knew or should have known that the stock could crash? I frankly don't think that that's necessarily an issue of fact because in ordinary tort law, foreseeability is given two tests, one with the judge, one with the jury. And the first one is always a question. And I think we're still with the first one. We're still with duty. It's always a question of law. Well, I don't think there's any question they have a duty to properly advise their client. And once they've found out about it. Do they have a duty to protect the value of his stock when they're giving him advice about the efficacy of the settlement? When they know it's as big as that. Or can they assume that the stock will remain where it's at? Do we want to extend the duty of a lawyer in advising his client in the divorce? And those who do divorce law will know that certainly the successful practice is more of a commercial practice than it is a domestic relation practice in that sense. Because you are basically dealing with allocations of estates and allocations of assets. Do they have that duty where they have to keep an eye on the stock market? No. What they have a duty to do is when they found out they screwed up and made a mistake, they have a duty to correct it. Because what they did is they bound the David Almaraz heinous. He could not exit the market. He could not diversify. Cause and effect. Now, it's also foreseeable that if you screw up a marital settlement agreement and your client can't get as big as the asset out and is subject to the vagaries of the stock market as well as the tortious interference of his ex-wife's counsel, that he is going to Well, one would think at the very least that you would have to develop a case on the standard of care. Did you have expert testimony that it's part of the duty of the lawyer to watch the value of the stock in the market? I know you had an expert. We had a distinguished expert who testified who said, once you know you made a mistake, you have the absolute duty to go correct it. And what happened in this case is But we're talking about the standard of care whether a lawyer in advising a client on a divorce settlement has a duty, it's part of the standard of care, to guarantee or be watchful for market fluctuations. No, our expert doesn't say that. He said it was a breach of the standard of care not to recommend diversification. And you've got a case, you've got a couple of cases out there. Ehrlich is one out of New Jersey. But in those cases, the people who were charged with diversification were under an underlying contractual duty or trust agreement duty. There were embedded in their duty to recommend diversification or to actually do it. A, they controlled the stock. The people that you're relying on, Ehrlich is a trustee. Right. And he controlled the stock. I can't remember now whether Ehrlich, was Ehrlich the IBM one? Yes. Anyway, they held the IBM stock for years and years and years and years. And it didn't grow as fast as the market did. Although depending on which point you entered the case, it might have been very prudent and a wise investment to hold on to the IBM. It's sort of like today if you tell somebody, I've got all of my shares in Google. And I'm your advisor. And I say to you, you know, I'm under an obligation to tell you that you should diversify. Get rid of some of your Google stock. Now, you have the stock. I don't have control. But I can't get rid of my Google stock. Well, even if you could, wouldn't you? There's evidence in the record that he would have. There's evidence in the record that come March of 2000 when the stakes were exposed. And both of these advisors had an opportunity to correct it. They made the situation worse. The ex-wife wants to get out of her stock. David Almaraz testified. It's in the record on March 17th. He said, great idea. Get me out of this. Let's go. And the two advisors combined to make the situation worse. They came up. They blamed each other for coming up with a harebrained scheme to trade unvested options, which may or may not have been right. But at the same time, if the stock had never crashed, which was totally the things that caused the stock to crash were totally independent of the negligence of your defendants. It had nothing to do with the negligence of your defendants. And so you are really focusing, you are focusing the question on the ultimate issue of damages, okay, basically. I mean, can you honestly say ever that the negligence of Mr. Snodgrass and the negligence of the Evanston investors or whatever they call themselves was the proximate cause of the stock losing its value? Of course, you can't say that. What you can say is that your negligence prevented me from an opportunity, an opportunity to exercise my option when? Whenever I wanted to? Whenever, January 5th, 2000, when the divorce was finalized? Okay. February 2000, when the mistakes were found and nobody took any action to cure it? Just to set this tableau correctly, I don't want you to think that I am necessarily at this point saying that in dealing with this kind of consequential damage, that loss causation will always mean that the perpetrator or the defendant has to be a factor in causing the loss of that which ultimately causes the loss to your client. In other words, he has to be the cause of your client's loss, for sure. Everyone agrees to that. That is a sine qua non, okay? But is that enough? In loss causation, at least in the securities areas involving 10b-5 actions and the like, the cases are pretty clear that they go beyond that. At least Justice Woods, in her two opinions that I saw, makes it very clear that what the defendant does actually has to be a factor in bringing the downturn to the market, such as advising him, put up all of your shares and the stock collapses, or do something that causes rumors to collapse the stock. But it's not enough simply that what she does results in a loss to your client if the professional, if the lawyer, doesn't actually do something which causes the market to slide. But I don't know that that should necessarily extend to your own financial advisors, for example. And you raise that issue in your brief, and I think it's a well-raised issue. So that when you hire somebody to protect your stock, to protect your interest in your stock, to prevent you from losing your stock, that's what he's there for. And he tells you, hold on to your stock, that you would necessarily apply a loss causation theory there, saying, well, the advisor's advice to you had no impact on the market. It just emptied your pockets, but it didn't do anything to the market, because by giving you that advice, all it did was it slowed you down, but time and other factors caused the market to collapse. I'm not prepared to go that far when you actually contract with someone to protect your stock, because it's the duty of that advisor to make some market forecasts. And if he's negligent in telling you to do something which increases your risk, then he's not doing what he's there to do. So that's where I have reservations about loss causation at this point in time. And I say that right now because, obviously, those financial advisors are going to be arguing, and you'll know where to address your arguments as far as I'm concerned. Did Candisco's demise have anything to do with the market? It was a gradual decline. I mean, they went out of business. It wasn't cataclysmic, as the trial court said. It took from January of 2000, when the divorce was finalized, stock reached its high in March of 2000. Those options didn't go underwater until February of 2001, almost more than a year after the divorce agreement was entered. And then the bankruptcy occurred in July of 2000, six months after the options went underwater. My client was frozen in a prison for a year and a half. This wasn't some sudden cataclysmic jump. When you say frozen, you mean he was actually legally prevented from doing it? No, he was told by his advisors that he couldn't exercise his options. The argument you make in your brief is that he wanted to exercise it. He expressed his desire to exercise it, but both Dormer and Snodgrass continued to advise him that he couldn't and shouldn't. That's different from saying that he was in a position where he legally couldn't do it. He could do it at all times. He could have put a stop order on it, too, couldn't he? He could have ignored his advisor's advice and done something off on his own, but he didn't. But the point is when you say he was frozen into this position, he was not frozen into it. He was given, in your opinion, bad advice. As it turned out, it was. It was terrible advice. We have expert opinions that say it was bad advice. I know, and then we get back to this diversification issue as a sine qua non for, and I find that kind of interesting, too, that you are now telling all financial advisors throughout the country that they may suffer. They may suffer the consequences of being sued for the failure of a stock, a hot stock, if they don't advise their client to diversify, no matter how good the stock is. Isn't that what you're saying? No, absolutely not. You don't think we would have to establish a standard of care. If you're advising a standard of care, as in the expert opinion. For the financial advisor, too. If he's being sued professionally, he's being sued for whatever you call it. It's a malpractice action, and did he violate the standard of care under the facts of this case? And it could very well be that where you have a soundly based stock, like Coca-Cola or something, or Google, and something happens and computers become totally obsolete out of the ordinary event, that that's not a violation of, that's not negligent to advise the client who gets in on the ground floor to hold it some more, even if it's more than that. But on the other hand, if the expert testifies that the standard of care for a financial advisor is never to allow the client to put all of his eggs in one basket, then you can travel with that. But you don't want to get to a jury with that. You don't want to do that. You don't want to say that, you know, because I advise you to keep all of your money with Madoff, that it's my fault that you lost all of your money. That's not what our expert says. I know. He said diversify. Our expert said Mr. Stadrass, for over a year and a half, gave bad advice. He didn't direct him to diversify. He didn't pay attention to that. But you are playing with a trodden principle of loss causation, which under circumstances in this universe would require that the advice of counsel, it's not enough that it causes a loss to his client. He has to be the cause of that which causes the client's loss. And that's where I make distinctions between a professional who's hired in a divorce context versus a professional who may be hired there to give you financial advice. Right. But that's not the distinction. Only in splitting off the concept of loss causation to modify it when we get to someone who is actually there for the purpose of protecting your assets. If you want to use loss causation, that Justice Woods in the Trident case. She uses loss causation. And she indicates that it's connected to foreseeability. And the duty has resulted in an injury that the duty was intended to prevent. That's a connection to foreseeability, and that's the use of loss causation. And in that case. Yeah, but she was the one who decided the subsequent case that establishes, that clearly is. . . I've got the case actually with me. What is it? Global market. He's talking post-trade. She says it's the same job. But that's about the same. . . The global security. Trident involved the exit from a market position in real estate that was precluded by environmental contamination. She establishes the fact that the advice given or the action of the defendant actually caused the situation that causes the drop in value. No, not in Trident. What the court ruled was that the defendant's misconduct impeded for 18 months that player from exiting the market. That's exactly what happened here if you're going to apply a loss transaction. Well, no, but you've got a problem, too, if you're going to rely on Trident. And that was the jury instruction in Trident, which would have precluded any consideration of the kind of damages that you're talking about here. If you recall the way the jury instruction was framed in Trident. Remember, it was loss of value of the property. But they did allow diminution in the opportunity to get out, and what that was worth. But, again, loss of causation is not the law in Illinois outside the fraud context. This isn't a fraud case. And I believe foreseeability governs causation. And there's expert testimony in this that, by my count, Mr. Snodgrass has 18 different breaches of duty between 1999 and the end of 2020. And Mr. Dorman. . . Based on Trident, this was a question that at least should have gone to the jury, and they would have been able to decide. Whether all of the loss of the stock was attributable to the behavior of Evanston and Snodgrass. But your expert basis on causation isn't very clear. What is his basis for the causation element? He, in particular, there is indicating that as a result of the errors in preparing the marital settlement agreement. . . As a result of errors in fixing it. . . In fact, taking no action to fix it when they should have. And he lists all the actions they could have taken to fix it. And, in fact, making the situation worse as time went on through more errors. What happened was Mr. Albaugh could not liquidate his. . . He could separate and divide his securities with his. . . Did not. Don't say could not. He could not without violating the advice given to him by. . . All right. Well, yes. But in order to have a proper basis for what you're trying to do here. . . Wouldn't one of the first determinations be as to what was the cause of the demise of Condisco to begin with? That's not in the record. I mean, the demise of Condisco had nothing really to do with the market. Nothing. It had to do with what happened in that company internally. Correct. And your expert doesn't seem to rely on that aspect of it in making his causation determination. Correct. So if we took your theory and bought into your theory, we still have a problem with the causation element. The issue would be whether when you make these type of mistakes and errors and you have these kind of conflicts that prevent you from giving independent representation, is it foreseeable that your client, relying on your advice, can't get out of his position and do what he wants to do and do what his own advisors are saying is in his best interest, which is he got a diversion. Yeah, but you see, you're talking in the general. Here your client is a very sophisticated person in the operation of Condisco. He's a salesman. Well, he was a salesperson there. That's a disputed fact issue. Pardon? That's a disputed fact issue as to my client's sophistication. Well, okay, but he did work for the company. He sure did. He knew it was kind of a closed deal there. Well, and it's in the record that he testified he didn't like the direction of the company. Well, of course. Because they were changing their business. I mean, they were in the business to begin with of selling used equipment in Europe and now they're going into telephones and other things that were outside their fields of expertise. He knew those kind of things. So the question really is, you know, when you get down to an expert's testimony, you know, if you're going to buy into an expert's testimony, there has to be a basis for that expert's testimony. And our experts, who are both experts in their fields, a certified financial planner, a CPA, and a longtime matrimonial lawyer, have gone through the standard of care and the ethical violations that were committed as well as the violations of the standard of care. See, I don't think that's a problem when you keep talking about the violation of the standard of care. See, you know, I think we're centralizing here on the causation issue. Then the causation, as the experts testify, if they had done their jobs, David Almroth could have got out in January, could have got out in February, could have got out in March, could have got out in April, May. And wanted to. And wanted to. And his options were not underwater until February of 2001. Yeah. That was over a year since the inept improperly prepared marital settlement agreement was consummated with a judgment that left my client unable to separate his securities positions with his ex-wife. And these two advisors were responsible. But do we, as a matter of policy, going back, and again, foreseeability in the initial analysis is the duty of the court under any tort analysis, foreseeability. It's a policy question. Do we want to impose upon advisors this kind of potential liability for bad advice? Well, here's what I would suggest, Your Honor. What's your best case for suggesting that a person who advises another on markets should face the possibility that his bad advice is always going to be, there's going to be the foreseeability that a market crash will come back to haunt him who gave the advice. Incidentally, along those lines, I want to go back. Can I let him answer this question? I want to know if he's got a case that addresses that precise point. Well, he might name Trident. Well, I don't think so, because Trident isn't a good analogy. Trident is an orthodox loss causation case. Yeah. Have you got a stock case? Sure. Russell Associates and Bradley. In the connection with an investment advisor who advises us to risk, advises us to keep a stock. A loss causation. And you cite that in your brief? We cite that in our brief. Okay. But would you agree that initially that's a job for the court to decide whether or not, under all of the circumstances, it was foreseeable that this particular defendant should have been charged with foreseeing the possibility that this event would occur? No. If, in fact, there are disputed fact issues. If a jury, if you give all reasonable inferences to us and there's a fact issue there. But we still have to impose a foreseeability obligation. Sure. There is a foreseeability obligation. I know that's what you're arguing. And what I suggest is Mr. Dormer should have quit on January 5th, or when he found out that the screw-up would happen. Yeah, I know. I understand your position. I'm not browbeating you. I just want to make sure I understand your position. It's important that I understand you, and I think I do. Okay. That's another issue. Let me set something straight in the record, though. We passed the Trident case as being a case that rejected loss causation. I did not say that. I said it was an application of loss causation. Diane Woods, who did the decision in Movitz, is now analyzing, reanalyzing the situation, distinguishing Movitz, by saying that in Trident, the reason there's liability in Trident is because the bank in Trident the loss by fessing up to certain structural defects, which would not encompass the entire value of the billmaker, so that she reaffirms her position that there has to be an impact on the actual cause of the loss. Justice Woods in Trident indicated that Movitz, which was authored by Justice Posner, that the loss that occurred had little or nothing to do with the duty that was breached, argued that Movitz was an analogy to loss causation in securities law, that the loss that occurred was not the kind that the bank's duties were designed to prevent. But Trident didn't involve securities. Trident didn't involve securities. It involved real estate. It involved real estate, and the loss causation analysis, if it's to be applied, which isn't the law in Illinois, but if it's to be applied, in that case, the injury caused the plaintiff impeded it from exiting the market. They couldn't sell this property. We understand your position. We've got to give your opponents an opportunity. They're sitting there waiting. Okay? We'll give you a chance to respond to all of them. Who's going first? You are? May it please the Court, I'm Kevin Duff. I represent employees Richard Dormer and Richard Dormer Limited. I've heard the questions of the Court on the loss causation issue, and our position is we'd ask the Court to affirm the judgment below of Judge Coleman. If the Court has other questions, I'd be happy to address those. Do we have to buy into her rhetoric to affirm? I'm sorry? Do we have to buy into her rhetoric to affirm? Your Honor, I think Judge Coleman got the substance of the law correct, and that's where the Court should affirm. Is there some distinction that we should note between loss causation and traditional proximate cause analysis? No. It's the same thing. In traditional proximate cause analysis, must there be a relationship in the action of the defendant between that action and that which causes the loss? In ordinary tort circumstances, let's say personal injury, it's natural that the proximate cause which predicts the loss also causes the loss because it's the act of negligence that creates the injury. But where do you get situations in ordinary tort litigation where the cause of the loss is collateral to the loss actually incurred by the party, such as losses in the market? The closest analogy would be like the tortious interference type of claims, or to maybe emotional distress type of claims maybe. But interference is a classical case where you interfere in a transaction which causes the loss. But in that particular, in those circumstances, it's ordinarily the interference can very well be the cause of the contract or whatever it is being, or the expectation being eliminated which causes the loss. So there are two, I think, even in, I'm changing my mind, even an intentional interference can better label it. That's right, sir. Otherwise it can create implosions. But that's the ordinary situation. So where do you have a tort situation that involves an action taken which can foresee the occurrence of a loss but not be a cause of that loss? And that's why the Illinois Supreme Court expresses the distinction between causation in fact and causation in law. Yeah, and I know why they did that, I don't know, because they've got a whole batch and a whole generation of lawyers are confused, and I'm being recorded. But wouldn't it be easier just to go to the traditional analysis of saying there could be more than one proximate cause? Everybody agrees on that as lawyers, don't we? There could be more than one proximate cause in any particular situation? Yes, I think so. Then the question becomes as you move farther and farther away in terms of actors contributing to the injury or the loss, the issue of proximate cause begins to fade. And the Supreme Court was trying to define this fading out. All he's saying is that there can be more than one proximate cause for the injury to his client. One obvious one was the complete collapse of the stock. Now that's a proximate cause of his injury, but it's not necessarily the only proximate cause of his injury. What he's suggesting is if your client hadn't been so negligent in his advice, he might have been able to intervene earlier in the collapse of his stock so that your client was also a proximate cause of his injury, the loss of all of that money from the failure of the stock. But there must be a relationship between the duty and the loss. Well, now we're back to duty and foreseeability. Except when you have experts advising clients, that is the defining proximate cause in terms of standard loss causation language is misleading. And you even cite cases that establish that. One of them happens to be my case, Glass v. Gittler, which is a case of malpractice against the lawyer for failing to advise his client that the law regarding bankruptcy would take a certain turn in the Seventh Circuit. And all I said there was it's not predictable. We're not going to sit and try to guess what prediction the lawyer should have made when the law was in a state of doubt and flux. But we didn't say in that case that the advice of the attorney, that the attorney cannot be held liable because even if his advice was bad, it didn't cause the change in the law or the interpretation of the law ultimately given by the Seventh Circuit. So there's a clear case where you have a proximate cause to the client without causing the source of the loss to be impacted. And you would argue it here as well. Oh, you cite Glass. Yes, well, we don't want a situation where divorce lawyers all of a sudden become the insurers of their clients' risky portfolios. And in this case, you have the plaintiff's own testimony says that he wasn't expecting Dorver, the lawyers, to provide any advice on the performance of Comdisco, the fluctuations in the stock market, or fluctuations in Comdisco's stock price. And that appears on page 131 of the plaintiff's deposition on October 23, 2005. We understand your position. Supposing the advice of the lawyer in this particular case would have been to hold on to the General Motors stock on the eve of its declaring that it would enter into bankruptcy. How would you handle that? Well, the defendant would have to have a duty to protect that asset. And a divorce lawyer simply doesn't have that duty. Well, supposing you're the divorce lawyer and your client has General Motors stock. And your client comes to you and says, you know, I want to break into this fund that we're holding for the wife, which your concern being that if somehow I break into the fund, there'll be a redefined allocation of assets. And you say, no, hold that stock. And I tell you, look, General Motors just announced that it will determine whether it's going into bankruptcy Monday morning. And you would say, hold it. And sure enough, Monday morning it declares bankruptcy and the stock is worth a penny. But it is also important that good legal advice does not necessarily have to be good investment advice. So your statement is no liability. No liability. I don't think you have a choice but to say that. No liability. We go back to the Ehrlich case because what you're arguing is that a divorce, and you just said it, that a divorce attorney isn't under any kind of an obligation, a duty to protect his client's financial assets. Is there any issue? That is the scope of it. His duty doesn't include that scope as opposed to Ehrlich where the trustee actually had control of the portfolio and was required to diorize the fund. We'd like to hear from the Evanston people. We're getting close to the proximate cause here. Ms. Hartman, on behalf of Evanston and Mr. Snodgrass, who got most of the focus of attention from everybody so far. Well, also I think from the plaintiff as well. Because clearly Evanston was giving advice. Hold it until it peaks. Sell it just before it starts to go down. That's great advice. That was the general recommendation in May of 1990, or I believe March of 1999, two months before the divorce, before Terranova re-filed for divorce. And Elmeroth admits that he was never able to act on that advice. So even assuming that… You're pointing the finger at the lawyers basically. Well, shouldn't we send that back to Justice Coleman? We'd have to send it to her successor, to her replacement. Because she predicated her ruling on loss causation theory. And the loss causation… And you're going to something else. No, Your Honors. That was not my intention. The loss causation doctrine is proximate cause. It's legal cause. It's an element of proximate cause. And it applies to financial advisors or financial planners. And when you look at the cases, they often are in terms of the defendants are… So what constitutes malpractice for a financial advisor? For a financial advisor, loss causation can be satisfied if they commit some type of conduct which directly causes the loss in the market, which didn't happen here, to under the market theory where their misrepresentation somehow elevates… So they're always insulated from liability because of the financial advice that they give? No, Your Honor. If their financial advice has a direct relationship, a direct impact on the investment's value, then… Yeah, so in other words, your answer should… There's only one thing wrong with your answer. You should have said no instead of yes because you're agreeing with Justice Kagel, that you can never be liable for financial advice unless you hire as your advisor one of the CEOs of the company that collapses. Actually, I'm not going that far. It's not that black and white. The two exceptions that I've already discussed are two ways where loss causation can be satisfied. There's a third way, and that's discussed in Ray, which is another opinion written by Justice Wood, in which she indicates that if the advisor indicates that this investment is risk-free and is very explicit in… Well, we know about all the disclaimers, the disclaimers that appear on every… But theoretically, that is a situation where… So in other words, if you go to a financial advisor, let's say it's an estate held by an incompetent, and the guardian retains an investment counsel to counsel the investments to be made, and he invests or she invests every asset into a stock that collapses, you mean there's no malpractice action involved here to recover for failure to diversify his holdings? Your Honor, I think that's a very different scenario. I think that relates more to the earlier case that was cited by Omar. That's a case where you have a financial advisor as a trustee. He wasn't a financial advisor. He was actually in charge of the portfolio. Every financial advisor, if you've retained them, becomes a fiduciary, doesn't he? So what's the difference? But Snodgrass and Evanston did not have control over the assets. Well, neither does this counselor in my hypothetical. And in a hypothetical, I control the facts. If you're the trustee, you have the discretion, you know, where the stocks should go. So I think if there's no control in your hypothetical… Just bad advice. Just bad advice, then I don't think you satisfy the loss of custody. What about a breach of contract? Can you establish that kind of duty on their contract with the advisor so that if he's… I have not seen a contract that… If he fails in his performance? Because that's the source of, I think, one of the sources of malpractice law that started originally way back when as contract law. Sure, Your Honor. And I have not seen a contract or I have not seen a case where, you know, you're able to establish cause, direct cause, foreseeability for a contract. That's the weakness of your position. I mean, you have to grapple with that ramification. And it seems to me that it's not really necessary for us to maintain that consistent align so that if we would agree with the Dormer position, we have to agree with yours as well. Your Honor, I think when you look at proximate cause, whether you call the loss causation loss causation or legal causation, it applies to all of the defendants. There's no distinction between an attorney or a financial advisor. The question is whether… Well, what's the danger? The danger, it seems to me, if we're talking in terms of the shibboleth of foreseeability, it makes more sense to talk about that when you're dealing with a professional whose advice is only collateral, oblique to financial safety advice, but it's advice of a legal nature or the efficacy of a settlement. There, what happens in the marketplace is so collateral that courts can pass it off to avoid being called legislatures as not having foreseeability. But what you hire that professional for is to guard the security of your assets. And he or she defaults on that to say that then he walks away or she walks away scot-free because his advice was not the cause of the depreciation of the market, is a stretch and a challenge. Your Honor, and I believe that the most recent decision by Justice Wood, the Seventh Circuit, in Ray v. Citigroup, goes through that analysis. And that was also a case where there were disappointed investors who sued their broker for professional malpractice, saying that you told us to buy into this stuff, you told us to buy into this stuff, almost to the exclusion. He was a broker. He wasn't a financial advisor as such. Correct. So it's more of a gray area with a broker. When does he become a financial advisor, if ever? Right. And when you look at the situation that we have here, there is no evidence that Algoroff promised or agreed to provide financial services as to the stock portfolio after the divorce. He provided analysis before the divorce, and then after the divorce, he was involved in doing the financial calculations as the parties were trying to split their assets. Although he did not, Algoroff, or sorry, Snodgrass, was not involved in the negotiation of the marital settlement agreement or the order splitting the marital lynching house. But he acquiesced and approved of that. He didn't approve it. He calculated the numbers. He actually didn't know about the entry of the marital settlement agreement until after it happened. With the agreed order regarding the marital lynching account, if you actually go back to the testimony that's cited by Algoroff in his brief, there's no evidence, there's no deposition testimony, indicating that Evanston or Snodgrass provided any advice or was in any way involved in the agreement that was reached between the parties to separate the marital lynching account. But I do want to go back to the point of Snodgrass and Evanston as financial advisors because this case involves financial losses and inclination to point the finger and to see a connection there. Lawyers are always the suspect. Sure. Well, in this case and in this day, financial advisors are as well. But what this court is, what would happen if you were to impose liability in this case against a financial advisor is setting forth a standard where you're making a financial advisor the insurer of stock market, of someone's investments. And that's not a duty that is recognized in Illinois law, and it's not a duty that Algoroff or Snodgrass or Evanston took on. And I think if you look at Ray, and you look at what Al Gormer says is his best case, Rishal and Broderick, they all involve brokers who for commission recommended specific securities and indicated that they were either risk-free or liquid and not speculative. And if you go back to the public information and you go back to the evidence in those cases, it was known to the broker that that was not true. And you have fraud in that case. And there is the exception as to why those cases don't apply. I think we understand your position. Thank you. Thank you. The Vanilla attorney. You're Ms. McKee? I am. How are you today? You've been waiting patiently. You used to be Ms. Olson, right? I used to be Olson, yes, Your Honor. Can we avoid the statute of limitations issue simply by saying, you know, if we were to rule in their favor or on everything else? Yes. So we don't even have to address the five-year, two-year dilemma? If you agree on the ruling on summary judgment, no, you don't. I only raised the cross-appeal because I have seen cases and in decisions of my cases where, as an athlete, the court has said you waived an alternate round. I understand your position. What's your best case for applying two years when Vanilla was not giving any advice to anybody here? The Polsky case. Polsky? Mm-hmm. Okay. Which is an accountant's case. It is. The claim for that statute is. The accountant, arguably, well, that gets us into a variable. Okay. With respect to the other arguments, I assume you're adopting the arguments of your colleagues pretty much. Anything you want to add to that? There is nothing I wish to add. Okay. Unless the Court has any more questions for the Vanilla attorney. Good argument. That was a tough one. Okay. Counsel, we're back to you. Again, I don't believe that law supervision is held by the court of Martin v. Heinhold has been applied in the Illinois court outside of the fraud case. I do believe, as Justice Cahill mentioned, that if you're going to limit the liability of Dormer on the basis of policy foreseeability, on these facts, that would be a bad policy decision. Mr. Dormer failed to disclose that Mr. Rinello was his personal attorney. He failed to disclose that, in fact, he was in investments with Mr. Rinello. He failed to disclose to Mr. Almaroth that he'd made mistakes, that he probably needed a new attorney. He then told him, don't, don't, don't exercise your options. Even though my job was to get you a mechanism so that you could get on with your life. Excuse me. Is there any of this litigation still alive at trial level? There was one claim that remains that wasn't decided by this sentence. There was a 304 order entered in this case. Mr. Dormer's counterclaim for attorneys. Okay. That's why you got the 304A language. That's correct. Okay. So are you saying that even if we would agree that there's loss causation, that there's other grounds for liability in this case, that has not been determined below so that it's not a global disposition? No. If you're saying that we have to prove the impossible, that David has to prove that Dormer and Snodgrass caused Convisco Stock to decrease. Now, that collapsed because it decreased over a year. That's the impossible verdict. That was obvious when this case was filed. That was obvious. No, and that's never been your focus. I mean, no, I think we understand your argument. Whether we buy into it or not is another issue. But I do understand you're not making a specious argument based on the fact that you're arguing that they caused the decline. No, all they caused was David's inability to do what he hired these two to do. Which were, A, one of several approximate causes for his loss. Right. They don't have to be the sole cause. Of course not. And it's up to a jury to determine who's responsible for what. I also will mention that the claims against Evans and Snodgrass are breach of contract and breach of fiduciary duty. And there is in the record the fact that Snodgrass advised Mr. Almaroth that, in fact, Convisco was a good stock. It was coming back. Don't worry about it. And, in fact, this idea where I'm going to get you more over-concentrated, don't worry about it. It's also a good idea. Well, if you're directing that to my inquiries about malpractice actions, I'm not saying, nor am I negating, but my proposition was not to simply put malpractice in a different category, but malpractice involving a contract or an arrangement to watch the safety of your stock. And the argument would still be there may be a malpractice action under Pellon case or whatever, because he may be in the position of being counsel even to the opponent as well, you know. But regardless of that, his malpractice is in the area of legal advice. And to bridge the gap between the default in his legal advice to his accountability for financial damage occurring in a different arena is still open to this loss causation theory. But that theory is in a vacuum as if his representation ended on January 5th. It didn't. It continued for another year. And during that time, he did no, knowing that he had made a mistake, which he admitted in open court in September of 2000, he took no steps to correct it. In fact, what he did was he allowed the tortious interference by the Rinella defendants to go uncheck. He didn't go to court and force the subaccounts. He didn't go to court to get the judgment amended. He didn't go to the court to say, give me a declaratory judgment that we made a mistake. We have to free these people. Do you still have the question whether the occurrence of a market depression or recession is something that is within the scope of duty as defined by the first test of foreseeability? It is foreseeable that if you lock your client into a position they can't get out of, it's foreseeable that damage is going to occur. Merrill Lynch account has nothing to do with loss causation. The expert testimony there shows both breach of the refrigerator duties and the standard of care both are responsible for. Counsels, thank you all. It was a very interesting case. It was well briefed and well argued by all of the parties involved in the case. We'll take it under advisement.